## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

JOSEPH B. BOXIE, JR.                              CIVIL ACTION NO. 12-CV-3170

VERSUS                                           JUDGE DOHERTY

COMMISSIONER, SOCIAL SECURITY    MAGISTRATE JUDGE HANNA

### REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of August 22,

2011.  Considering the administrative record, the briefs of the parties, and the

applicable law, it is recommended that the case be reversed and remanded.

### BACKGROUND AND COMMISSIONER'S FINDINGS

Joseph Boxie filed applications for a period of disability, disability

insurance benefits and supplemental security income benefits under Titles II and

XVI of the Social Security Act on October 15, 2010, alleging disability beginning

January 14, 2010 due to a low back injury. [Tr. 138][1]. The claim was initially

denied, and Boxie filed a  written request for hearing, which was granted.  The

hearing was held on July 21, 2011, and a decision was issued by Administrative

Law Judge Kim A. Fields, denying the claim on August 22, 2011. [Tr. 18].  Boxie

---

[1]The administrative record and the transcript of the administrative hearing are made a part
of the record at Rec. Doc. 4-1. Pages are numbered at the bottom right corner, and transcript
references will be made in this document as Tr. ___.

sought review by the Appeals Council which denied his request on October 25, 2012, making the ALJ's decision the Commissioner's final administrative decision.   On December 31, 2012, Boxie filed the instant Complaint in this Court, seeking judicial review of the ALJ decision pursuant to 42 U.S.C. §405(g). [Rec. Doc. 1]

### APPLICABLE  LEGAL STANDARDS  AND  SCOPE OF REVIEW

Any individual, after any final decision of the Commissioner of Social Security in which he was a party may obtain a review of the decision by a civil action. 42 U.S.C. 405(g). This court's review of the Commissioner's decision is limited to determining whether that decision was supported by substantial evidence and whether the proper legal standards were applied in reaching that decision.  *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). In making that determination, the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing.  42 U.S.C.A. §405(g).

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible, and any findings of fact by the Commissioner that are supported by substantial evidence

-2-

are conclusive and must be affirmed. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

'Substantial evidence' is such relevant evidence as a responsible mind might accept to support a conclusion; it is more than a mere scintilla and less than a preponderance. *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd v. Apfel,* 239 F.3d at 704. Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire record must be scrutinized as a whole. *Singletary v. Bowen*, 798 F.2d at 823. In applying this standard, the court may not re-weigh the evidence in the record, try the issues *de novo,* or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision. *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). To determine whether the decision to deny social security benefits is supported by substantial evidence, the court weighs the following factors: (1) objective medical facts; (2) diagnoses and opinions from treating and examining physicians; (3) plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) plaintiff's age,

-3-

educational background, and work history. 42 U.S.C.A. §405; *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).  Any conflicts in the evidence regarding the claimant's alleged disability are to be resolved by the administrative law judge, not the reviewing court.  *Newton v. Apfel*, 209 F.3d at 452.

*Disability* is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).  *Substantial gainful activity* is defined as work activity involving significant physical or mental abilities for pay or profit. 20 C.F.R. §404.1572(a)-(b).

In determining whether a claimant is disabled, the ALJ uses a five-step sequential analysis, which requires analysis of the following:  (1) whether the claimant is currently engaged in substantial gainful activity (i.e., whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing  past relevant work (i.e., whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant

-4-

from doing any other work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005);

*Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209

F.3d at 453.  See, also, 20 C.F.R. § 404.1520. If the ALJ determines that the

claimant is disabled at any step, the analysis ends.  20 C.F.R. § 404.1520(a)(4).

     If the ALJ cannot make a determination at any step, he goes on to the next

step.  20 C.F.R. § 404.1520(a)(4).  Before going from step three to step four, the

Commissioner assesses the claimant's residual functional capacity. 20 C.F.R. §

404.1520(a)(4). The claimant's residual functional capacity assessment is a

determination of the most the claimant can still do despite his physical and mental

limitations and is based on all relevant evidence in the claimant's record. 20 CFR §

404.1545(a)(1). The claimant's residual functional capacity is used at the fourth

step to determine if the claimant can still do his past relevant work, and at the fifth

step, it is used to determine whether the claimant can adjust to any other type of

work. 20 CFR § 404.1520(e).  When a claimant's residual functional capacity is

not sufficient to permit him to continue his former work, then his age, education,

and work experience must be considered in evaluating whether he is capable of

performing any other work.  *Boyd v. Apfel,* 239 F.3d 698, 705 (5th Cir. 2001); 20

C.F.R. § 404.1520.  The testimony of a vocational expert is valuable in this regard,

as such expert "is familiar with the specific requirements of a particular

occupation, including working conditions and the attributes and skills needed."
*Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

The claimant bears the burden of proof on the first four steps, and then the burden shifts to the Commissioner on the fifth step to show that the claimant can perform  other substantial work in the national economy.   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

When a mental disability claim is made, such as bipolar disorder or major depressive disorder, the ALJ utilizes a corollary sequential procedure for determining the merits of the claim.  Essentially, this procedure  substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings.  The regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment.  Furthermore, §404.1520(a)(e) provides that the ALJ must document his application of this technique to the claimant's

-6-

mental impairments.  *Satterwhite v. Barnhart*, 44 Fed. Appx. 652(5th Cir. 2002)(unpublished).

Impairments that remain constant at all levels of exertion form an important part of residual functional capacity.  These impairments are called non-exertional impairments, because the claimant suffers these impairments constantly, whether or not he exerts himself.  Allergies are non-exertional impairments, and may be severe.   Intolerance to stress may also be a non-exertional impairment.  Side effects from medications have also been included as non-exertional impairments. Pain can be a non-exertional impairment when it exists whether or not the claimant is exerting himself in physical activities.

### ASSIGNMENT OF ERRORS

In the instant case, Joseph Boxie asserts that (1) the ALJ erred in failing to recognize that his condition meets or is equivalent to the criteria in the list of impairments described in 20 C.F.R., Part 404, Subpart P, Appendix 1–Specifically Section 1.04(A) and (C); and (2) the ALJ erred in finding that jobs exist which fall within the Boxie's residual functional capacity by failing to address the effect of Boxie's pain and prescription medicine use, social phobias and anger, and inability to remain on task. [Rec. Doc. 6, p. 1].

### ANALYSIS AND DISCUSSION

*The Administrative Record:*

Joseph Berchman Boxie, Jr. is 46 years of age, with a birth date of April 25, 1968.  He was 41 years old on the alleged disability onset date and he was 43 years old at the time of the ALJ's decision.  He completed high school and obtained additional training as a commercial truck driver.  He has no problem speaking, understanding, reading or writing the English language. He has done past work as a building maintenance repairperson, front-end loader operator, commercial truck driver, gardener, mobile home and automobile salesperson, and driving instructor. [Tr. 168-74]. He has not worked since January 14, 2010 for reasons he associates with a lower back injury.  [Tr. 138]. He had back surgery on September 27, 2010. [Tr. 141].

Boxie completed the SSA Function Report in December, 2010, indicating that his low back problems did not allow him to bend and lift, and he reported total numbness in his left leg. [Tr. 158].  He described his abilities to care for his personal hygiene needs without problems, except for some difficulty dressing due to his inability to pick his legs up too high. [Tr. 159].  At that time he confirmed he could drive a car, do some shopping for groceries and clothes, pay bills, handle a checkbook and count change. [Tr. 161].  He indicated he could follow written and spoken instructions, could pay attention well, and finished what he started.  [Tr. 163] . He

-8-

was using a walker, cane and brace, but only the brace was prescribed by a doctor. He was taking Lortab and Soma, prescribed by his doctor.  They caused nausea and drowsiness. [Tr. 164-65].

Medical records submitted span the time period from June, 2009 to mid-April, 2011.  The first reference to Boxie's complaints of back pain came in a January 14, 2010 emergency room visit to Our Lady of Lourdes Regional Medical Center in Lafayette, Louisiana.  Boxie reported a work-related incident when he felt sudden pain in his midline back while bending over.  On examination, he was found to have moderate tenderness in the area, with normal sensation of the L5 and S1 dermatomes and normal reflexes.  No focal neurological deficit was observed.  X-rays revealed no acute abnormality of the lumbar spine.  Disk spaces and vertebral body heights and alignment were noted to be maintained, and soft tissues were unremarkable.  Records document the impression of a lumbar sprain with instructions that Boxie follow up with his primary care physician. [Tr. 269-273].  In a second visit to a different emergency room two days later, a similar impression was recorded, with similar instructions to Boxie that he should follow up with his doctor. [Tr. 207-208].  Boxie returned to the Lourdes ER on February 2, 2010, complaining of back pain down into his legs.  He denied numbness, tingling pain or parasthesias in the perineal area and he denied bowel/bladder dysfunction.  On examination, he was found to have normal

-9-

range of motion and alignment, with no costovertebral angle tenderness.  Strength was noted to be normal, as were motor, coordination and sensory findings.  There was moderate  tenderness of the lumbar spine and a notation of a positive straight leg raising test at 30 degrees sitting/distracted.  The diagnosis was recorded as back strain, with instruction for follow up with a primary care physician. [Tr. 264-267].  Boxie returned to the same ER the next day reporting that he was out of medications including Lortab and Flexeril.  Records note the frequent visits to different emergency rooms.  On examination Boxie was able to stand on his toes and heels without difficulty and with normal sensation over the L5-S1 dermatome. Straight Leg Raise was positive on the left.  Mechanical back pain was noted with left sciatica.  Boxie was again instructed to see his primary care provider. [Tr. 259-262].

Boxie visited the emergency room of Lafayette General Medical Center twice in February, 2010.  Records reference a CT scan showing disk protrusion with central canal and bilateral foraminal narrowing at L4-L5. [Tr. 201-205].  Boxie also reported he was out of his prescribed medications.  He was noted to have lower extremity motor strength of 5/5, with sensory abnormality noted in the left leg. The record from February 8, 2010 contain the results from a lumbar MRI showing L4-L5 acquired central canal stenosis with disc protrusion; bilateral foraminal narrowings, worse on the left and L5-S1 central to right paracentral disc extrusion compressing the thecal

sac and right lateral recess, with mild compression on the proximal right exiting nerve root. [Tr. 199-200]. The final impression noted was that of disc herniation and thecal sac compression, with a notation that Boxie could return to work once cleared by his doctor. [Tr. 197-198]. The next day, Boxie visited the emergency room at University Medical Center, where he was diagnosed with low back pain and left sciatica and released to his normal activities. [Tr. 222-224]. He was referred to the LSU neurosurgery department at Shreveport, Louisiana. [Tr. 217].

The claimant visited four different emergency rooms in February, 2010. He did not see a primary care physician as recommended. More than once he was told that the emergency room was not the appropriate place for chronic narcotic administration. [Tr. 233-234]. As of February 23, 2010, Boxie was noted to be in mild distress, secondary to pain. He wanted Lortab. On examination, Boxie's Straight Leg Raises were bilaterally negative; he had decreased range of motion secondary to pain, and his strength was noted to be 5/5, with 2+ bilateral DP. [Tr. 215]. By March 6, 2010, when he visited the Lafayette General Medical Center emergency room, Boxie reported trouble urinating, but no bladder distention was noted on examination. Tenderness and antalgic gait were noted, but lower extremity motor strength was noted to be 5/5 on the right and 4/5 on the left. [Tr. 189].

In a visit to the Lourdes emergency room on March 12, 2010, Boxie reported he was out of medications and had been told by his attorney to go to the emergency room until he could see his doctor.  He denied problems with his legs giving out, but reported weakness in his left leg.  On examination, he was noted to have normal alignment, decreased range of motion, and tenderness in the low back.  Positive straight leg raises were reported bilaterally, without costovertebral angle tenderness. [Tr. 248-250].  Sensation and reflexes were symmetrical bilaterally at 1-2+.  Six days later Boxie appeared at the internal medicine clinic at University Medical Center and he was scheduled for neurosurgery at LSU Shreveport. [Tr. 210-212].

On March 30, 2010, Boxie returned to Opelousas General Hospital ER with continued complaints of low back pain.  Records document a normal neurological exam regarding motor strength, sensation and reflexes; no pedal edema was noted, and pulses were equal.  Straight leg raise tests resulted in pain at 15 degrees on the right and at 30 degrees on the left. [Tr. 229-231].  Three days later, Boxie visited the Lourdes ER with similar complaints.  On examination, he was noted to be tender along the lower thoracic and lumbar spine, with no obvious spasm.  Reflexes, sensation and muscle tone were normal in both lower extremities.  A positive straight leg raise test was noted. [Tr. 242-245].

On May 11, 2010, Boxie saw Dr. Louis Blanda on referral by his attorney.   On examination, Dr. Blanda noted antalgic gait on the right and positive spasm.  Straight Leg Raise test was positive on the right at 45 degrees and on the left at 60 degrees. Mild extensor weakness was noted, along with absent achilles reflexes, weak plantar and flexion strength on the right, decreased sensation in the L5-S1 dermatome, 1+ patellar reflexes, and no pathological reflexes. [Tr. 277].  X-rays of the lumbar spine showed mild degeneration; the lumbar MRI showed acquired central canal stenosis with disk protrusion; bilateral foraminal narrowing, worse on left; L5-S1 central to right paracentral disk extrusion compressing the thecal sac and right lateral recess; and  mild compression on the right exiting nerve root.  Dr. Blanda concluded that Boxie had a significant herniated disk at L5-S1. [Tr. 277].   He recommended EMG/nerve conduction studies of both legs, and he opined that Boxie would probably need surgery.  The EMG/NCV studies confirmed radiculopathy, and by June, 2010, Dr. Blanda sought authorization for the surgery.  A second opinion evaluation was done by Dr. Gregory Gidman on July 22, 2010, and Dr. Gidman agreed with the surgery recommendation.

Surgery was performed by Dr. Blanda on September 27, 2010, to include a lumbar laminectomy and diskectomy at L4-5 bilaterally and L5-S1 on the right; foraminotomies for stenosis; pedicle screw instrumentation, and bone grafting.  Boxie

made good progress after surgery and he was discharged in stable condition on September 30, 2010. [Tr. 291].

The record contains documentation of four follow up visits with Dr. Blanda. On October 8, 2010, X-rays showed hardware in excellent position, with copious bone graft noted. [Tr. 294]. One month later, Boxie still had some left buttock and leg pain, but overall he was feeling better.  X-rays looked good, and on examination, Boxie was noted to have only a "weakly positive" straight leg raise result on the left. [Tr. 295].  By January 4, 2011, Boxie was doing fair, with complaints of left calf and little toe numbness, with occasional complaints of back pain.  X-rays again showed hardware in good position, and Dr. Blanda noted the fusion appeared to be healing. He noted a slight positive straight leg raise result; strength of 4/5 on the left and 5/5 on the right; and deep tendon reflexes at "trace" throughout. [Tr. 306].  On the last visit with Dr. Blanda in the record, on April 14, 2011, X-rays still showed good position of the hardware and graft.  Boxie's left leg remained weak, but the doctor noted there had been significant nerve damage pre-operatively.  No spasm was noted, and Boxie had a mild limp.  He complained of anxiety. [Tr. 304].

The record also contains the Psychiatric Review Technique Form completed by Pamela Martin, Ph.D. on December 10, 2010, after review of Boxie's medical records.  She found that Boxie had a nonsevere impairment of affective disorders.  He

-14-

had mild limitations in his activities of daily living-mostly related to his physical condition, mild difficulties in maintaining social functioning, concentration, persistence and pace, and no episodes of decompensation. [Tr. 49-55].

*The Administrative Hearing:*

At the claimant's request, a hearing was conducted by ALJ Kim Fields on July 21, 2011.  Testimony was taken from Joseph Boxie, who confirmed he was 43 years old at the time, with a high school diploma and training from a truck driving school. [Tr. 30].  He described his work history to include truck driving and work as an engineer. [Tr. 31] He testified that he no longer had a driver's license and was not able to drive. [Tr. 30].  He continued to take medication to relieve his symptoms, and they took "the hurting pain" away, with side effects including drowsiness, anxiety, and fast heart rate. [Tr. 31-32].  He testified he could walk about 500 feet before his leg gave out, and he had fallen a couple of times.  He could stand for 20-30 minutes, and sit for 1-2 hours before having to get up and move around due to stiffness.  He could lift 5-10 pounds. [Tr. 31-32].  He could do light household chores, but stated he has "no courage" for it, leaving cooking and shopping to his wife.  He could not walk to the stores for shopping, and he did not want people to see him using a wheelchair cart. [Tr. 32-33].  In response to questions from his attorney, Boxie testified he was in pain every day and had problems finishing tasks and concentrating,

which he attributed to anxiety. [Tr. 34]. He took Lortab and Percocet daily for pain, and he also took Oxycodone. [Tr. 34]. He did not think he could qualify for a commercial drivers license because of these medications and his history of surgery. He did not think he would be comfortable doing a job where he needed to deal with people, even on the telephone. [Tr. 35]. He described getting angry at nothing and having difficulty getting along with his wife due to pain and anxiety. [Tr. 36].

Wendy Clem was called by the ALJ to testify as a vocational expert. She confirmed she had studied the claimant's vocational history in the record, including a period of self-employment as a landscape worker doing flower beds in new residential homes. She also confirmed her familiarity with the definitions of sedentary, light, medium and heavy work and unskilled, semi-skilled and skilled jobs. [Tr. 37-38]. She described Boxie's past work as a building maintenance repairer as medium, skilled work (SVP 7); his work as a front-end loader operator as medium, semi-skilled work (SVP 3), and his work as a tractor trailer truck driver as medium, semi-skilled work (SVP 4). [Tr. 38-39]. Boxie's past work as a driving instructor was classified as light, semi-skilled work (SVP4). His work as a mobile home salesperson was light, semi-skilled (SVP 5), and his work as an auto salesperson was light, skilled (SVP 6). The gardening work described by Boxie was medium, semi-skilled (SVP 3). [Tr. 39-40].

The expert was presented with a hypothetical question by the ALJ, and she was asked to assume an individual with the same age, education as Boxie, with the exertional ability to do sedentary work with limitations of sitting 1-2 hours at a time, alternating with standing for less than 20 minutes before returning to a seated position, and remaining on task.  With those assumptions, Clem opined that such a person could not do any of Boxie's past relevant work, but that there are nevertheless jobs in the national economy such a person could do.  She illustrated with the positions of sorter (sedentary, semi-skilled, SVP 3; 2,500 jobs in the state economy, 346,025 in the national economy) and check cashier (sedentary, semi-skilled, SVP 3; 14,085 in the state economy, 743,300 in the national economy. [Tr. 40].

In response to questions from the claimant's attorney, the expert testified that if the individual could not remain on task due to anxiety and pain, then such individual would not be able to maintain employment. [Tr. 41] The expert could not say whether narcotic pain medications would make such person unsuitable for employment, since that would be a medical question, but she indicated that if the person could stay on task, his medications would be a non-issue. [Tr. 41].  When asked to assume the individual had pain and anxiety to the extent it prevented normal social interactions and caused disruptive behavior in the workplace, the expert opined that such a person could not maintain employment. [Tr. 42].

-17-

*The Determination of the ALJ:*

The record demonstrates that the ALJ followed the requisite five step sequence in analyzing the claims of Mr. Boxie.  He found, at step one, that the claimant has not engaged in substantial gainful activity at any time relevant to his decision. [Tr. 12]. This finding is supported by the record. At step two, the ALJ determined that Boxie had the severe impairment of "status post diskectomy and fusion with back pain (20 CFR §§404.1520(c) and 416.920(c))." [Tr. 12].  He also noted that Boxie has a medically determinable impairment of obesity, which the ALJ found to be non-severe. Although Boxie has asserted depression, the ALJ found no medical evidence to support the presence of a severe mental impairment, relying on the opinion of a medical consultant to which he gave great weight. [Tr. 13].  Neither the depression nor the obesity were considered to be more than a slight abnormality which did not significantly limit the claimant's ability to perform basic work-related activities. Applying the requisite Paragraph B criteria, the ALJ found the claimant's medically determinable mental impairment to be nonsevere. [Tr. 14].  At step three, the ALJ determined that Boxie does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, giving specific consideration to the musculoskeletal listings (1.00). [Tr. 14].  The claimant challenges this finding.

-18-

The ALJ then, after considering the entire record, found that Boxie has the residual functional capacity (RFC) to perform sedentary work as defined in 20 CFR §§404.1567(a) and 416.967(a) except with the need to sit 1-2 hours at a time at which time he must alternate standing for less than 20 minutes before returning to the seated position and remain on task. [Tr. 14].  The RFC was reached after considering the claimant's medical record history, his testimony at the hearing and "giving the claimant every consideration." [Tr. 16].  The ALJ noted the claimant's assertion that he is disabled, but that the record does not support such a finding.  While the ALJ found that Boxie's medically determinable impairments could reasonably be expected to cause his alleged symptoms, he found the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with the RFC. [Tr. 15].  At step four, the ALJ found that Boxie is unable to perform any of his past relevant work. [Tr. 17]. At step five, the ALJ found that considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Boxie can perform. [Tr. 17].  The claimant has challenged this finding.

### The Step Three Analysis by the ALJ requires remand.

The claimant's first assignment  of error deals with the ALJ's step three analysis and finding. At step three, the ALJ concluded that Boxie does not have an

impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR §§404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). [Tr. 14]. Boxie contends that the ALJ erred in failing to recognize that his condition meets or is equivalent to the listing for spinal disorders at Section 1.04(A) and (C). In considering this assignment of error, the Court looks first to the ALJ's explanation at step three, which is minimal:

> The medical evidence does not substantiate that the claimant's impairments meet or equal a listing. Specific consideration was given to the musculoskeletal listings (1.00). [Tr. 14].

When assessing a claim for disability benefits in the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. *Sullivan v. Zebley*, 493 U.S. 521, 525(1990). If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, the Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. §423(d)(2)(B). The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See*

*Zebley*, 493 U.S. at 531.  It is the claimant's burden to prove at step three that his impairment or combination of impairments matches or is equivalent to a listed impairment. *Id.* at 530-31.  For a claimant to demonstrate that his disorder  matches an Appendix 1 listing, he must meet all of the specified medical criteria.   An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify. *Id.*  Ultimately, the question of equivalence is an issue  reserved for the Commissioner.  *Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993).

In making the determination that a claimant's symptoms fail to qualify for the presumption of disability afforded by the listings, the ALJ, at step three, should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he/she reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment.   A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is "beyond meaningful judicial review." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).   The step three analysis in this case, as set out in the written decision, cannot be considered meaningful judicial review by the *Audler* standard or the requirement set out in §405(b)(1) which calls for "a discussion of the evidence" and "understandable language" stating the reasons upon which the determination is made.  The Court recognizes that procedural perfection in administrative proceedings is not

-21-

required, and a judgment will not be vacated unless a party's substantial rights have been affected.  *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).  The Court also recognizes that the ALJ obviously made a careful review of the record in this case, evidenced by the record references elsewhere in the decision.  However, at the critical step three stage, which could trigger the presumption of disability, that detail shown in other aspects of the decision is lacking, and this Court does not have the authority to re-weigh the facts or substitute its judgment for that of the ALJ and the Commissioner.  Thus, the error assigned by the claimant and acknowledged by the Commissioner cannot be considered harmless.

### *The Step Five analysis is consistent with applicable law and supported by sufficient record evidence.*

Since the court has found that remand is appropriate for reconsideration of the step three analysis, perhaps the Court need not reach at this time Boxie's second assignment of error relative to step five.  However, for completeness of the record, the Court addresses the claimant's second assignment of error that the ALJ erred in finding that jobs exist which fall within the Boxie's residual functional capacity by failing to address the effect of Boxie's pain and prescription medicine use, social phobias and anger, and inability to remain on task. [Rec. Doc. 6, p. 1].

The record demonstrates that the ALJ recognized that Boxie's ability to perform sedentary work has been impeded by additional limitations, which he set out in the RFC, namely his need to sit 1-2 hours at a time at which time he must alternate standing for less than 20 minutes before returning to the seated position and remain on task. [Tr. 14].  Significantly, the RFC is consistent with Boxie's hearing testimony about his physical limitations. [Tr. 31-32].  It was in response to questions from his attorney that Boxie offered additional testimony about his prescribed medications and problems finishing tasks and concentrating, which he attributed to anxiety. [Tr. 34]. Boxie opined he would not be comfortable doing a job where he needed to deal with people, even on the telephone, and he described getting angry at nothing and having difficulty getting along with his wife due to pain and anxiety. [Tr. 36].  The ALJ rejected that testimony,  finding the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the RFC. [Tr. 15]. The determination contains specific references to the Psychiatric Review Technique Form completed by Pamela Martin, Ph.D. after review of Boxie's medical records.  She found that Boxie had only mild limitations relative to social functioning, concentration, persistence and pace.

The ALJ then correctly proceeded to determine the extent to which Boxie's recognized limitations erode the unskilled sedentary occupational base by questioning

-23-

the VE with hypothetical questions consistent with the RFC set out in the determination. The use of a vocational expert is appropriate when the analysis moves to step five and a determination must be made of whether the claimant's skills can be used in other work and of what other specific jobs are possible for the claimant and available to him. 20 CFR §404.1566(e).   In response to the ALJ's hypothetical questions, the VE identified two sedentary employment positions existing in the national and state economies which Boxie could perform, allowing for the readjustment limitation described by the ALJ. [Tr. 40].   On that record, the undersigned finds no fault with the ALJ's method or conclusions.  The Fifth Circuit has held that an ALJ need only incorporate into the hypothetical questions posed to a vocational expert those claimed disabilities that are supported by the evidence and recognized by the ALJ.  Thus, it is not significant that the ALJ rejected the VE's testimony regarding the claimant's expanded hypotheticals.  *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002)*;  Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  Only the question which posed the hypothetical containing the elements of the ALJ-determined RFC needed to be asked.  In the instant case, the record demonstrates that the ALJ rejected the opinions/assessments which formed the basis for the claimant-preferred questions., and therefore, there is no basis for reversal based on the step five analysis.

## CONCLUSION AND RECOMMENDATIONS

As discussed above, this Court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021(5th Cir. 1990).  It is well-settled that the Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.  *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  The Court finds that the error by the ALJ relative to the step three analysis in this case makes it impossible to determine whether the ALJ properly considered the claimant's symptoms as presented relative to the appropriate listings.  The step five analysis by the ALJ comports with applicable law and is supported by the record.

Applying the appropriate review standard to the record of the instant case,

**IT IS THE RECOMMENDATION** of the undersigned that the decision of the Commissioner be REVERSED AND REMANDED for a proper step three analysis with detailed reasons and record references as required by §405(b)(1) and consistent with other applicable legal standards.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of

Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plan error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 9th day of February, 2015.

_____

Patrick J. Hanna
United States Magistrate Judge

COPY SENT:

DATE: ___2/9/2015_____
BY: _____EFA_____
TO: _____RFD_____
cg

-26-